No. 21-11314-DD

---

IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

---

Consumer Financial Protection Bureau,

Plaintiff-Appellant,

*v.*

Ocwen Financial Corp.;

Ocwen Mortgage Servicing, Inc.;

Ocwen Loan Servicing, LLC;

PHH Mortgage Corp.,

Defendants-Appellees.

---

On Appeal from the United States District Court for the Southern District of Florida

Hon. Kenneth A. Marra

Case No. 17-cv-80495

---

**Brief of Plaintiff-Appellant
Consumer Financial Protection Bureau**

---

Stephen Van Meter
  *Acting General Counsel*
Steven Y. Bressler
  *Assistant General Counsel*
Lawrence DeMille-Wagman
  *Senior Litigation Counsel*
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
(202) 435-7957
lawrence.demille-wagman@cfpb.gov

*CFPB v. Ocwen Fin. Corp.,* No. 21-11314-DD

## CERTIFICATE OF INTERESTED PERSONS

In compliance with Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, Plaintiff-Appellant Consumer Financial Protection Bureau, identifies all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the particular case:

Alexis, Anthony

Altisource Portfolio Solutions, S.A. (Ticker symbol ASPS)

Alvarez, Joaquin

Azuero, Catalina E.

Baez, Tianna E.

Barrett, Bernard J.

Berry, Bridget A.

Bondi, Pam

Brenowitz, Stephanie C.

Bressler, Steven Y.

Buckley LLP

Burke, Joanna

Burke, John

*CFPB v. Ocwen Fin. Corp.,* No. 21-11314-DD

Butler, Victoria

Cammarata, Anthony

Chiu, Shirley T.

Clarke, Edwina

Cohen, Adam H.

Coleman, John, R.

Consumer Financial Protection Bureau

Cordray, Richard

Craven, Laura S.

DeMille-Wagman, Lawrence

Desai, Atur R.

Farrell, Patrick

Fauley, Robynne

Fransen, Scott R.

Goodwin Procter LLP

Granai, Sasha F.

Greenburg Traurig, LLP

Grenadier, Janice Wolk

Healey, Jean M.

*CFPB v. Ocwen Fin. Corp.,* No. 21-11314-DD

Hefferon, Thomas M.

Jay, William

Jovanov, Pedrag Patrick

Kelly, Erin M.

Kraninger, Kathleen

Lichter, David H.

Marra, Kenneth A.

Matthewman, William

McLeod, Mary

Moody, Ashley

Mulvaney, Mick

Nodler, Gregory R.

Ocwen Financial Corporation (Ticker symbol OCN)

Ocwen Loan Servicing LLC,

Ocwen Mortgage Servicing Inc.,

Office of Attorney General, State of Florida, Department of
    Legal Affairs

Office of Financial Regulation, State of Florida, Division of
    Consumer Finance

O'Malley, Gabriel

*CFPB v. Ocwen Fin. Corp.,* No. 21-11314-DD

Petersen, Cara

PHH Corp.

PHH Mortgage Corp.

Pinder, Jennifer H.

Posner, Michael

Previn, Matthew P.

Protess, Amanda B.

Riffee, Matthew L.

Roberson, Amanda C.

Rose-Smith, Sabrina M.

Savage, James J.

Sepulveda, Robert

Sheldon, Matthew S.

Singelmann, Jan E.

Smith, Tierney E.

Stoll, Laura

Subramanium, Denise

Sugarman, James

Tayman, W. Kyle

*CFPB v. Ocwen Fin. Corp.,* No. 21-11314-DD

Torres, Susan

Uejio, David

USVI Services, LLC

Van Meter, Stephen

Ward, Thomas

Wein, Andrew S.

Wells, John C.

Wilkinson, Miriam

Wilson, Jack Douglas

Winship, Blaine H.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Consumer Financial Protection Bureau requests that the Court conduct oral argument because the Bureau believes that argument will assist the Court in understanding the application of the doctrine of res judicata to the facts of this case.

# TABLE OF CONTENTS

**PAGE**

CERTIFICATE OF INTERESTED PERSONS .............................. C1 of 5

STATEMENT REGARDING ORAL ARGUMENT ................................... i

TABLE OF CONTENTS ............................................................ ii

TABLE OF CITATIONS ......................................................... iv

STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION ................................................................. vii

STATEMENT OF THE ISSUES ................................................... 1

INTRODUCTION ..................................................................... 2

STATEMENT OF THE CASE ...................................................... 5

    A. Parties ...................................................................... 5

       1. The Bureau ............................................................. 5

       2. Defendants .............................................................. 6

    B.  The Consent Judgment ............................................... 7

    C.  Proceedings below ..................................................... 11

       1. The Bureau's action ................................................ 11

       2. The district court's decision ..................................... 14

STANDARD OF REVIEW ......................................................... 17

SUMMARY OF THE ARGUMENT .............................................. 17

ARGUMENT ........................................................... 20

I.    THE DISTRICT COURT APPLIED THE
      WRONG TEST WHEN IT ASSESSED THE
      RES JUDICATA EFFECT OF THE
      CONSENT JUDGMENT ................................................. 20

      A. *Norfolk Southern* dictates the appropriate
      res judicata analysis in this case .................................... 21

      B. The district court failed to apply *Norfolk Southern* ................. 22

      C. Under *Norfolk Southern*, the
      Consent Judgment does not bar this action ................................ 24

II.   THE DISTRICT COURT INCORRECTLY
      APPLIED TRADITIONAL PRINCIPLES
      OF RES JUDICATA ........................................................ 33

CONCLUSION ........................................................... 42

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF CITATIONS

**Page(s)**

## CASES

*Arrieta-Gimenez v. Arrieta-Negron,*
   551 So.2d 1184 (Fla. 1989) .................................................. 24

*Blue Heron Com. Grp., Inc. v. Webber,*
   808 F. App'x 922 (11th Cir. 2020) ...................................... 17

*Bowen v. Pub. Agencies Opposed to*
*Soc. Sec. Entrapment*, 477 U.S. 41 (1986)........................... 28

*CFPB v. Ocwen Fin. Corp.*, No. 13-cv-2025 (D.D.C.) .............................. 7

*Citibank, N.A. v. Data Lease Fin. Corp.,*
   904 F.2d 1498 (11th Cir. 1990)........................................... 23

*Davila v. Delta Airlines, Inc.,*
   326 F.3d 1183 (11th Cir. 2003)........................................... 23

*Evans v. Deutsche Bank Nat'l Trust Co.,*
   No. 14-cv-14431, 2015 WL 12746108 (S.D. Fla. Jan. 23, 2015) ......... 24

*FTC v. Colgate-Palmolive Co.*, 380 U.S. 374 (1965).......................... 30, 37

*Hamilton v. Suntrust Mortg. Inc.,*
   6 F. Supp. 3d 1300, 1303 (S.D. Fla. 2014)............................ 8

*In re Piper Aircraft Corp.,*
   244 F.3d 1289 (11th Cir. 2001) ......................................... 23

*Lawlor v. National Screen Serv. Corp.* ................................... 32
   349 U.S. 322 (1955)

*Maldonado v. United States Att'y Gen.,*
   664 F.3d 1369 (11th Cir. 2011)......................................... 34

\* *Norfolk S. Corp. v. Chevron, U.S.A., Inc.*,
   371 F.3d 1285 (11th Cir. 2004)..........4, 16-19, 21-24, 26, 28, 29, 32, 33

*Office of the Att'y Gen. v. Ocwen Fin. Corp.*,
   No. 17-cv-80496 (S.D. Fla.) ...................................................................... 11

*Paradise v. Prescott*, 767 F.2d 1514 (11th Cir. 1985),
   *aff'd sub nom. United States v. Paradise*,
   480 U.S. 149 (1987) ..................................................................................... 23

*Pleming v. Universal-Rundle Corp.*,
   142 F.3d 1354 (11th Cir. 1998) ............................................................. 34, 39

*Ragsdale v. Rubbermaid, Inc.*,
   193 F.3d 1235 (11th Cir 1999)................................................................ 23, 33

*Richardson v. Ala. State Bd. of Educ.*,
   935 F.2d 1240 (11th Cir. 1991)................................................................... 23

*Welcome v. Sec'y of the Navy*,
   782 F. App'x 929 (11th Cir. 2019) .............................................................. 17

**STATUTES**

Consumer Financial Protection Act of 2010, 12 U.S.C. §§ 5481-5603 ..... 5

12 U.S.C. § 5481(14)....................................................................................... 6

12 U.S.C. § 5491(a).......................................................................................... 6

12 U.S.C. § 5531(a).......................................................................................... 6

12 U.S.C. § 5536(a)(1)(B) ............................................................................... 6

12 U.S.C. § 5564............................................................................................... 6

12 U.S.C. § 5565(a)(1) .................................................................................. vii

v

Dodd-Frank Wall Street Reform and Consumer
Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) ..................... 5

28 U.S.C. § 1291.................................................................................. vii

28 U.S.C. § 1331.................................................................................. vii

28 U.S.C. § 1345.................................................................................. vii

**RULES**

12 C.F.R. § 1024.2............................................................................... 7

12 C.F.R. § 1024.31............................................................................. 7

12 C.F.R. § 1026.41(d)................................................................. 12, 40

Fed. R. App. P. 4(a)(1)(B) ................................................................. vii

## STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION

The district court had subject-matter jurisdiction over this matter because it was brought under a federal consumer financial law, 12 U.S.C. § 5565(a)(1), presented a federal question, 28 U.S.C. § 1331, and was brought by the Consumer Financial Protection Bureau (Bureau or CFPB), an agency of the United States, *id.* § 1345.

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 because this is an appeal from a Final Judgment (Doc. 777), which disposed of all claims against all Defendants.[1] The Bureau's Notice of Appeal (Doc. 779), which was filed on April 21, 2021, was timely pursuant to Fed. R. App. P. 4(a)(1)(B) because the district court's Final Judgment was entered on April 21, 2021.

---

[1] Documents filed in the proceeding before the district court are referred to as "Doc. xx."

# STATEMENT OF THE ISSUES

The district court determined that nine counts of the Bureau's complaint were barred by the doctrine of res judicata as a result of a Consent Judgment that was entered in 2014 by the United States District Court for the District of Columbia pursuant to a settlement agreement between the Bureau and Ocwen. The issues on appeal are whether, when applying the doctrine, the court erred:

1. by failing to apply rules of contract interpretation to assess the preclusive effect of the Consent Judgment;

2. by interpreting the Consent Judgment, and a Release that was part of that Consent Judgment, to preclude the Bureau's claims concerning conduct that occurred after the filing of the D.C. complaint even though the Release did not waive the Bureau's right to pursue violations that occurred after the filing of that complaint; and

3. by both applying traditional principles of res judicata to the facts of this case (in lieu of the rules of contract interpretation) and applying those principles incorrectly.

## INTRODUCTION

On December 19, 2013, the Bureau, joined by 49 states and the District of Columbia, filed a complaint in the United States District Court for the District of Columbia against Ocwen Financial Corp. and its wholly owned subsidiary Ocwen Loan Servicing, LLC, challenging certain practices that they had engaged in when they serviced home mortgages (D.C. complaint). In conjunction, the Bureau also filed a proposed Consent Judgment that settled all the allegations in the D.C. complaint. In February 2014, the D.C. district court entered that Consent Judgment, settling the matter. The Consent Judgment provided more than $2 billion in relief for consumers injured by Ocwen's practices and included fencing-in provisions governing Ocwen's conduct going forward. The Consent Judgment also provided for appointment of a monitor who, for three years (*i.e.*, until February 2017 when the Consent Judgment expired), would oversee Ocwen's compliance with those fencing-in provisions. The Consent Judgment included a Release, which described its preclusive effect, and which applied to Ocwen and any of its subsidiaries. The Release stated that the Bureau released Ocwen from liability resulting from the mortgage servicing practices

described in the D.C. complaint *only if* those practices had occurred before the date the D.C. complaint was filed. To emphasize its limited nature, the Release further stated that the only claims that the Bureau released were those that were asserted in, or might have been asserted in, the D.C. complaint. The Consent Judgment also provided that compliance with the fencing-in provisions did not obviate Ocwen's obligation to comply with state and federal law.

In April 2017, the Bureau filed its complaint in this case in the United States District Court for the Southern District of Florida. The Bureau named the two defendants who were named in the D.C. complaint, as well as another wholly-owned subsidiary of Ocwen Financial Corp. (Ocwen Mortgage Servicing, Inc.). In a subsequent amended complaint, the Bureau added PHH Mortgage Corp., a successor-by-merger to Ocwen Loan Servicing (hereinafter all defendants named in the Florida complaint are referred to as "Ocwen"). Doc. 1.[2] The Bureau's Florida action, which is now before this Court,

---

[2] The Bureau's April 2017 complaint was supplanted in 2019 by the Bureau's First Amended Complaint (Doc. 481), and in 2021 by the Bureau's Second Amended Complaint (Doc. 775). The district court's

was not based on violations of the Consent Judgment. Rather, this case involves new claims about different conduct that occurred after Ocwen entered into the Consent Judgment. Indeed, the complaint in this case alleges, among other things, that Ocwen violated regulations that had not even taken effect until after Ocwen had entered into the Consent Judgment. Because this case challenges only practices that occurred after the date that the D.C. complaint was filed, those practices are not shielded by the Release.

But in April 2021, the district court granted Ocwen's motion for summary judgment, holding that the claims in nine counts of the Bureau's First Amended Complaint (FAC) were barred by the doctrine of res judicata. In doing so, the court applied traditional principles of res judicata. This was wrong because, as this Court explained in *Norfolk Southern Corp. v. Chevron, U.S.A., Inc.*, 371 F.3d 1285, 1289 (11th Cir. 2004), the res judicata effect of a settlement agreement is determined not by traditional principles of res judicata, but by the intent of the parties to the settlement. And that intent is assessed by

---

Order addressing the parties' motions for summary judgment relates to the counts in the FAC.

4

applying principles of contract interpretation to the settlement agreement. Here, the intent of the parties with respect to the res judicata effect of the Consent Judgment was plainly expressed in the Release – the Bureau and Ocwen agreed to release only claims based on conduct that occurred prior to the filing of the D.C. complaint. Because the FAC challenges exclusively conduct that occurred after the filing of the D.C. complaint, those claims were not released and the district court's judgment should be reversed.

Further, not only did the district court err by applying traditional principles of res judicata, it compounded its error by applying those principles incorrectly.

## STATEMENT OF THE CASE

### A.  Parties

**1. The Bureau** – As part of its response to the 2008 financial crisis, Congress enacted the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5481-5603.[3] The CFPA established the Bureau as an independent executive agency and charged it with

---

[3] The CFPA is Title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010).

enforcing certain pre-existing consumer financial laws including the Truth in Lending Act (TILA), the Fair Debt Collection Practices Act (FDCPA), and the Real Estate Settlement Procedures Act (RESPA). *Id.* §§ 5481(14), 5564. Congress also charged the Bureau with enforcing the newly enacted CFPA, which, among other things, prohibits unfair, deceptive, or abusive acts or practices in connection with consumer financial products or services. *Id.* §§ 5491(a), 5531(a), 5536(a)(1)(B).

**2. Defendants** – Defendant Ocwen Financial Corp. is one of the nation's largest servicers of home mortgage loans, and it specializes in the servicing of distressed mortgages. Doc. 764 at 4. It is the parent of defendant Ocwen Mortgage Servicing, which is in turn the parent of defendant Ocwen Loan Servicing, LLC. *Id.* Defendant PHH Mortgage Corp. is, as the result of a merger, the successor to Ocwen Loan Servicing. *Id.*

Mortgage servicing encompasses a variety of activities, including collecting payments from borrowers, applying those payments according to the terms of the mortgage, handling escrow accounts, making payments necessary to maintain the mortgaged property if

the borrower fails to do so, loss mitigation,[4] handling complaints from borrowers, pursuing collections from delinquent borrowers, and, when necessary, managing the foreclosure process. *See* 12 C.F.R. § 1024.2; Doc. 481 at ¶ 15.

## B.  The Consent Judgment

On December 19, 2013, the Bureau, along with 49 states and the District of Columbia, filed the D.C. complaint against Ocwen Financial Corp. and Ocwen Loan Servicing in the United States District Court for the District of Columbia. *CFPB v. Ocwen Fin. Corp.*, No. 13-cv-2025 (D.D.C.). According to the D.C. complaint, Ocwen, among other things, failed to apply payments made by borrowers in a timely and accurate manner, charged borrowers unauthorized fees for default-related services, imposed force-placed insurance on borrowers when Ocwen knew or should have known that those borrowers already had adequate home-insurance coverage,[5] deceived consumers about foreclosure

---

[4] "Loss mitigation" is "an alternative to foreclosure offered by the owner or assignee of a mortgage loan that is made available through the servicer to the borrower." 12 C.F.R. § 1024.31.

[5] Many mortgage contracts require the borrower to maintain insurance on the property to protect the lender's interest. If the borrower fails to

alternatives, and engaged in illegal foreclosure practices including robo-signing foreclosure documents and filing affidavits without verifying the information. *Id.* at 12-13. The D.C. complaint alleged that these practices were unfair and deceptive and violated the CFPA. *Id.* at 15-16.[6] In conjunction with the D.C. complaint, the Bureau also filed a Consent Judgment, which had already been signed by all the plaintiffs and by Ocwen.

On February 26, 2014, the D.C. district court entered that Consent Judgment, thereby settling the case. *See* Doc. 32-1.[7] The Consent Judgment required Ocwen to provide more than $2 billion in relief for the benefit of consumers injured by its practices. *Id.* at 11-12. It also required Ocwen to comply with certain "Servicing Standards" that were set forth in a 46-page exhibit to the Consent Judgment. *Id.* at 10, 67-113. The Servicing Standards provided detailed procedures for

---

adequately insure the property, the servicer may "force-place" the insurance and pass the cost on to the borrower. *See Hamilton v. Suntrust Mortg. Inc.*, 6 F. Supp. 3d 1300, 1303 (S.D. Fla. 2014).

[6] The state plaintiffs alleged that the same practices that the Bureau challenged also violated various state consumer protection laws.

[7] The 2014 Consent Judgment was filed in this case as Doc. 32-1.

Ocwen to follow in connection with, *inter alia*: 1) the documents that it used for bankruptcy and foreclosure proceedings; 2) its oversight of any third parties that Ocwen retained in connection with mortgage servicing; 3) the procedures it followed when borrowers were in bankruptcy; 4) how it dealt with borrowers who were eligible for loss mitigation programs; 5) its compliance with statutory protections for military personnel; 6) making sure that any servicing fees were authorized and reasonable; and 7) the imposition of forced-placed insurance. *Id.* at 67-113. To make sure that Ocwen complied with the Servicing Standards, the Consent Judgment provided for appointment of a monitor who was to oversee Ocwen's practices and prepare regular reports. *Id.* at 11, 122-136. The monitor was to measure Ocwen's compliance with some, but not all, of the Servicing Standards against 33 compliance metrics. *Id.* at 137-158. However, the Servicing Standards, and indeed the D.C. complaint, did not apply to every aspect of Ocwen's mortgage servicing practices. For example, the Servicing Standards did not address whether Ocwen was performing timely escrow analyses. *See id.* at 67-113, 137-158.

9

Finally, and particularly relevant here, the Consent Judgment included a Release that specified the claims that the Bureau would release as a result of the Consent Judgment. *Id.* at 160-163.[8] The Release provided that:

> the CFPB fully and finally releases the Released Parties [*i.e.* Ocwen] from all potential liability that has been or might have been asserted by the CFPB relating to mortgage servicing practices described in the complaint (the "Mortgage Servicing Practices") that have taken place as of 11:59 p.m., Eastern Standard Time, on December 18, 2013.

*Id.* at 162. The Release further provided that "[n]otwithstanding any other term of this Release, the CFPB specifically reserves and does not release any liability for conduct other than conduct related to the Mortgage Servicing Practices asserted or that might have been asserted in the complaint." *Id.*

The Consent Judgment provided that it would "remain in full force and effect for three years from the date it is entered," *i.e.*, until February 26, 2017. *Id.* at 13.

---

[8] The Consent Judgment included a separate release that applied to the state plaintiffs. Doc. 32-1 at 165-174.

10

## C.  Proceedings below

**1. The Bureau's action** – The Bureau filed its initial complaint in this matter on April 20, 2017, Doc. 1, and filed the FAC on October 4, 2019, Doc. 481. In both versions of the complaint, the Bureau challenged only conduct that occurred since January 2014 (*i.e.*, after the date of the claims released by the Release).[9] Several counts of the FAC were based on allegations that, when loans were transferred to Ocwen for servicing, Ocwen failed to adequately verify the accuracy and completeness of the information it received regarding the loans, failed to correct inaccurate information, and had a records management system that was described as "a train wreck" by Ocwen's head of servicing. *Id.* at ¶¶ 38-56. Count I alleged that (since January 2014) Ocwen engaged in an unfair practice in violation of the CFPA by using inaccurate and incomplete information to service loans, and that this

---

[9] The same day that the Bureau filed its complaint, Florida's Office of the Attorney General and Office of Financial Regulation also initiated an action against the same defendants named in the Bureau's complaint. *Office of the Att'y Gen. v. Ocwen Fin. Corp.*, No. 17-cv-80496 (S.D. Fla. complaint filed Apr. 20, 2017). Florida's complaint, like the Bureau's, challenged only conduct that occurred after the filing of the D.C. complaint. In October 2020, Florida and Ocwen entered into a settlement, which included monetary and injunctive relief.

was likely to result in the billing of incorrect amounts, the imposition of inappropriate fees, the submission of inaccurate information to credit bureaus, and the pursuit of unlawful foreclosures. *Id.* at ¶¶ 205-212. Count II alleged that (since January 2014) Ocwen engaged in deceptive practices in violation of the CFPA because, as a result of the inaccurate loan records it maintained, it made misrepresentations to borrowers regarding various amounts that were due. *Id.* at ¶¶ 213-217. Count III alleged that (since 2014) Ocwen misled borrowers regarding steps they could take to forestall foreclosure. *Id.* at ¶¶ 218-222. Count IV alleged that Ocwen violated a provision of the TILA's implementing Regulation Z (12 C.F.R. § 1026.41(d)), a provision that did not take effect until January 2014. In particular, it alleged that Ocwen had failed to provide borrowers with certain monthly statements that, among other things, provided accurate details of the components of borrowers' monthly payments. The count alleged that this failure also violated the CFPA. Doc. 481 at ¶¶ 228-231.

Counts V and VI alleged violations of both the CFPA and the FDCPA that occurred since January 2014. These counts alleged that, in part because of the inaccurate loan information that Ocwen maintained,

12

it used unfair and unconscionable means, and made material misrepresentations in connection with the collection of debts that were subject to the FDCPA. *Id.* at ¶¶ 238-250. Counts VII-IX alleged that (since January 10, 2014) Ocwen violated RESPA, its implementing Regulation X, and the CFPA. In particular, Ocwen failed to conduct timely analyses of borrowers' escrow accounts, failed to send required escrow statements, and failed to pay borrowers' hazard insurance premiums. *Id.* at ¶¶ 254-260. Ocwen failed to maintain policies and procedures necessary to properly handle borrowers' complaints; failed to ensure that, with respect to a borrower's account, all its personnel had access to current information regarding the status of the servicing of that account; and failed to transfer complete and accurate information when Ocwen transferred an account to a new servicer. *Id.* at ¶¶ 261-266. And Ocwen improperly pursued foreclosure in connection with certain borrowers who had submitted applications for loss mitigation. *Id.* at ¶¶ 267-277.

Finally, Count X alleged that Ocwen violated the Homeowners Protection Act and the CFPA by failing to automatically terminate

13

private mortgage insurance for borrowers whose principal balance no longer exceeded 78% of the secured property's value. *Id.* at ¶¶ 284-287.

**2. The district court's decision** – After extensive discovery, the Bureau and Ocwen filed cross-motions for summary judgment. Docs. 728, 730. On March 4, 2021, the district court issued its order denying the Bureau's motion and granting Ocwen's motion in part. Doc. 764.[10] Relevant to this appeal, the court held that Counts I-IX of the FAC were barred by the doctrine of res judicata to the extent that those counts challenged conduct that occurred prior to February 26, 2017 (the sunset date for the Consent Judgment). *Id.* at 3. The court denied Ocwen's motion with respect to Count X of the FAC because it concluded that a genuine issue of fact remained outstanding with respect to whether Ocwen had violated the Homeowners Protection Act. *Id.*[11]

---

[10] The district court's order specifically denied the Bureau's motion for summary judgment only with respect to Count X. Doc. 764 at 29-31. But it effectively denied the remainder by granting Ocwen's motion.

[11] The court ordered the Bureau to submit a supplemental statement indicating whether it wanted to pursue Counts I-IX with respect to conduct that occurred *after* February 26, 2017. Doc. 764 at 30. On April 1, 2021, the Bureau submitted its statement informing the court that it did not intend to pursue Counts I-IX as to conduct that occurred after February 2017, and that it would dismiss, with prejudice, Count X in its

In reaching its decision, the court first noted that, in the Eleventh Circuit, "a defendant asserting *res judicata* must establish four elements: (1) a prior decision rendered by a court of competent jurisdiction; (2) a prior decision that constitutes a final judgment on the merits; (3) an identity of parties or their privies; and (4) an identity of causes of action." *Id.* at 14-15. The court held that there was no dispute that the action that resulted in the Consent Judgment satisfied the first three elements. *Id.* at 16.

The court then concluded that the fourth element was also satisfied:

> The Bureau's claims at Counts 1-9 are … substantially the same as those covered by the … Consent Judgment. They stem from the same wrong – Ocwen's use of incomplete and inaccurate loan account data in the servicing of residential mortgage loans …. At Counts 1 through 9, the Bureau essentially realleges the same misconduct as that alleged in the [D.C. complaint].

---

entirety. Doc. 770. The Bureau then filed its Second Amended Complaint on April 19, 2021. Doc. 775. The Second Amended Complaint included only the first nine counts and challenged only conduct occurring from January 2014 through February 26, 2017. In light of the filing of the Second Amended Complaint, the court issued its Final Judgment, granting Ocwen's motion for summary judgment and denying the Bureau's motion. Doc. 777. That Final Judgment is the subject of this appeal.

*Id.* at 21-22. The court concluded that:

> [a]s to alleged loan servicing misconduct occurring *before* February 26, 2017 (the expiration of the three-year term of [the] Consent Judgment), the Bureau does not identify new matters that were not or *could not have been* subjected to the dispute resolution procedures and enforcement mechanism prescribed by the [Consent] Judgment….

*Id.* at 22 (emphasis in original). And as to allegations in the FAC that charged Ocwen with violations of regulations that did not take effect until January 2014, the court stated that it was "not persuaded that the overlapping consumer protections relayed under these regulations support a showing of a 'new wrong.'" *Id.*

The court also rejected the Bureau's argument that, pursuant to *Norfolk Southern*, *supra*, the language of the Release in the Consent Judgment should establish its res judicata effect. The court recognized that the Consent Judgment "released liability only for violations up through" December 18, 2013. *Id.* at 23. But it held that "[t]here is no language in the Release supporting the ability of the Bureau to bring suit for wrongs covered by the Consent Judgment – which includes wrongs arising during the three-year term of [the] Judgment." *Id.* Thus, it held that "because the Bureau's current claims at Counts 1-9 are concededly matters covered by the Servicing Standards, the Bureau's

16

new claims are precluded even under the application of the *Norfolk Southern* modified version of *res judicata*." *Id.* at 26. Accordingly, the court held that even though "the Bureau now better understands the cause and ramifications of the servicing misconduct alleged in the [Bureau's D.C. complaint] and wishes to cast a wider statutory net over it," this "does not avoid a *res judicata* bar" over all claims based on conduct pre-dating February 26, 2017. *Id.* at 27.

## STANDARD OF REVIEW

The issue on review is whether the district court correctly held that nine counts of the Bureau's FAC were barred by the res judicata effect of the Consent Judgment. That presents this Court with a question of law, which it reviews *de novo. Welcome v. Sec'y of the Navy*, 782 F. App'x 929, 932 (11th Cir. 2019). To the extent this Court chooses to address the district court's application of the traditional principles of res judicata, that review should also be *de novo. Blue Heron Com. Grp., Inc. v. Webber*, 808 F. App'x 922, 926 (11th Cir. 2020).

## SUMMARY OF THE ARGUMENT

In *Norfolk Southern*, this Court overturned a lower court's analysis of the res judicata effect of a settlement agreement. This Court

17

explained that the lower court erred because it used the traditional four-part test for evaluating res judicata, a test that is applicable when the previous decision has been fully litigated but not when that decision is the result of a settlement agreement. Because there had been a settlement, the lower court should instead have based its decision with respect to preclusive effect on the intent of the parties as expressed in the settlement agreement.

The district court here made the same mistake as the lower court in *Norfolk Southern* – it applied the four-part test when it analyzed the res judicata effect of the 2014 Consent Judgment that resolved the Bureau's first case against Ocwen. Based on this analysis, and after the Bureau filed its Second Amended Complaint, the district court granted final judgment for Ocwen. But the 2014 Consent Judgment contained a Release, which specifically described the intent of the parties with respect to res judicata. According to the Release, the only claims that the Bureau was precluded from bringing against Ocwen were those that were based on practices that had taken place on or before December 18, 2013, the day before the Bureau filed its complaint and proposed Consent Judgment. The Release also specifically reserved the Bureau's

18

right to challenge conduct that had not been released. In this case, the Bureau challenges only acts or practices that Ocwen committed in 2014 or later. Thus, applying the proper analysis prescribed by this Court in *Norfolk Southern*, the settlement that resulted in the 2014 Consent Judgment should have no preclusive impact on this case.

Not only was it wrong for the district court to apply the traditional four-part test to evaluate the res judicata effect of the Bureau's first action against Ocwen, but the district court compounded its error by applying that test incorrectly. Under the four-part test, a previous final judgment will have a res judicata effect only with respect to issues that were resolved in the previous lawsuit and that must also be resolved in the current one. But there were no issues resolved in connection with the entry of the 2014 Consent Judgment because the matter was settled before any litigation took place. So instead, the district court in this case based its res judicata analysis on the scope of the fencing-in relief that was part of the Consent Judgment and was in effect until February 2017. The court believed that the fencing-in relief applied to some of the conduct challenged in the FAC. And as to the remaining conduct, the court faulted the Bureau for not seeking modifications to expand the

scope of the Consent Judgment's fencing-in relief so that it would also apply to that conduct. Based on this, the district court held that the Bureau's current case was barred. But there is no support, and the district court cited none, for this approach to the application of the traditional four-part test to assessing the res judicata effect of a settlement agreement.

## ARGUMENT

## I. THE DISTRICT COURT APPLIED THE WRONG TEST WHEN IT ASSESSED THE RES JUDICATA EFFECT OF THE CONSENT JUDGMENT

The district court erred when it applied traditional principles of res judicata to conclude that the Consent Judgment barred this action. Instead, as this Court has explained, a court assessing the res judicata effect of a settlement agreement should employ principles of contract interpretation to determine the intent of the parties to that agreement. Had the court applied those principles, it should have concluded that the Consent Judgment poses no bar to the Bureau's allegations in the FAC.

20

## A. *Norfolk Southern* dictates the appropriate res judicata analysis in this case

In *Norfolk Southern Corp. v. Chevron, U.S.A., Inc.*, 371 F.3d 1285, 1289 (11th Cir. 2004), this Court set forth the appropriate way to analyze the res judicata effect of a consent judgment based on a settlement agreement, such as the one that the Bureau and Ocwen entered into in 2013. In *Norfolk Southern*, the district court had applied traditional principles to determine the res judicata effect of a settlement agreement. The district court concluded "that a claim that would typically be barred under res judicata may be preserved only if a party makes a 'clear expression' of a 'reservation of right' to bring suit on the basis of that claim in the future." *See* 371 F.3d at 1288.

This Court, rejecting the district court's analysis, held that the preclusive effect of a settlement "should not be determined by the claims specified in the original complaint, but instead by the terms of the Settlement Agreement, as interpreted according to traditional principles of contract law." *Id.* at 1289. The basis for this Court's holding was its observation that, because res judicata is an affirmative defense, it may be waived. *Id.* Thus, "[i]n determining the res judicata effect of an order of dismissal based upon a settlement agreement, we

21

should also attempt to effectuate the parties' intent. The best evidence of that intent is, of course, the settlement agreement itself." *Id.* And, "[w]here the plain meaning of an agreement is clear, we may not go beyond the four corners of the document to look for additional evidence of the drafters' intentions." *Id.* at 1290. Finally, when it comes to shaping the res judicata effect of a settlement, "we do not see a need to treat an express description of claims excepted from *res judicata* any differently from an express description of claims subject to *res judicata*. In both cases, the preclusive effect of the earlier judgment is determined by the intent of the parties." *Id.* at 1290 (quotation marks omitted).

Here, the settlement agreement that resolved the allegations of the D.C. complaint is embodied in the Consent Judgment. Thus, a determination as to the res judicata effect of the Consent Judgment should be based on the intent of the parties to that judgment (*i.e.*, the Bureau and Ocwen) as expressed in that judgment.

## B. The district court failed to apply *Norfolk Southern*

The district court failed to recognize that *Norfolk Southern* dictates how it should have evaluated the res judicata effect of the Consent Judgment. Instead, that court invoked the traditional four-part

test. *See* Doc. 764 at 22 (court noted that it was reaching its conclusion "under traditional *res judicata* applications"). In so doing, the district court relied on cases that did not involve the res judicata effect of an earlier settlement reached by the same parties. *See Id.* at 15, citing *In re Piper Aircraft Corp.*, 244 F.3d 1289 (11th Cir. 2001) (res judicata effect of an order of a bankruptcy court), *Davila v. Delta Airlines, Inc.*, 326 F.3d 1183 (11th Cir. 2003) (res judicata effect of an adjudicated decision on the merits), and *Richardson v. Ala. State Bd. of Educ.*, 935 F.2d 1240 (11th Cir. 1991) (previous case did not involve the same parties). The district court compounded its error by considering the "claims and legal theories brought in [the] prior complaint," Doc. 764 at 15, the very sort of analysis that this Court explained was inappropriate when assessing the res judicata effect of a settlement. *See Norfolk Southern*, 371 F.3d at 1289.[12] And most crucial, the district

---

[12] The district court cited five cases in support of the proposition that "a consent decree is considered a former adjudication on the merits which is entitled to res judicata effect." Doc. 764 at 16. But none of those cases supports the court's failure to apply *Norfolk Southern.* Indeed, four of those cases pre-dated *Norfolk Southern. See Paradise v. Prescott*, 767 F.2d 1514 (11th Cir. 1985), *aff'd sub nom. United States v. Paradise*, 480 U.S. 149 (1987); *Ragsdale v. Rubbermaid, Inc.*, 193 F.3d 1235 (11th Cir 1999); *Citibank, N.A. v. Data Lease Fin. Corp.*, 904 F.2d 1498 (11th

court ignored the intent of the parties to the Consent Judgment, which was set forth in detail in the Release attached to the Consent Judgment.

### C. Under *Norfolk Southern*, the Consent Judgment does not bar this action

As this Court explained, the res judicata effect of a settlement is determined by the intent of the parties to that settlement. And "[t]he best evidence of that intent is, of course, the settlement agreement itself." *Norfolk Southern*, 371 F.3d at 1289. Here, the intent of the parties to the Consent Judgment with respect to preclusive effect is set forth in the Release, which was attached to the Consent Judgment as Exhibit E. Doc. 32-1 at 160. The Release provides that:

> Subject to the exceptions in Paragraph C (concerning excluded claims) below, the CFPB fully and finally releases the Released Parties from all potential liability that has been or might have been asserted by the CFPB relating to mortgage servicing practices described in the complaint (the

---

Cir. 1990); *Arrieta-Gimenez v. Arrieta-Negron*, 551 So. 2d 1184 (Fla. 1989). The only case that post-dated *Norfolk Southern* merely held that, for purposes of the *Rooker-Feldman* doctrine, a state court consent judgment should be considered a final state court judgment. *See Evans v. Deutsche Bank Nat'l Trust Co.*, No. 14-cv-14431, 2015 WL 12746108 at *1 (S.D. Fla. Jan. 23, 2015). That case provided no support for the district court's res judicata analysis of the Consent Judgment.

"Mortgage Servicing Practices") that have taken place as of 11:59 p.m., Eastern Standard Time, on December 18, 2013.[13]

*Id.* at 162. It further provides:

> Notwithstanding any other term of this Release, the CFPB specifically reserves and does not release any liability for conduct other than conduct related to the Mortgage Servicing Practices asserted or that might have been asserted in the complaint. Furthermore, the CFPB specifically reserves and does not release any liability arising under any provision of the Equal Credit Opportunity Act, the Home Mortgage Disclosure Act, or any other statute or law that prohibits discrimination of persons based on race, color, national origin, gender, disability, or any other protected status.

*Id.* The Release also provides that "Nothing in this Release shall limit the CFPB's authority with respect to the Released Parties, except to the extent the CFPB has herein expressly released claims." *Id.*

Thus, the Release provides that the parties to the Consent Judgment released only those claims that the Bureau asserted, or that the Bureau might have asserted, in the D.C. complaint. The Release

---

[13] The preamble to the Release explains that the "Released Parties" encompass "Ocwen Financial Corporation and Ocwen Loan Servicing LLC … and Ocwen's current and former parent corporations, divisions, affiliates, direct and indirect subsidiaries, agents, advisors, shareholders, managers, members, partners, directors, officers, and employees," *i.e.*, all the defendants named in the FAC.

reinforces this limit because it also states that the only claims that are released are those "that have taken place as of 11:59 p.m., Eastern Standard Time, on December 18, 2013" – the last minute of the day before the D.C. complaint was filed. As this Court explained in *Norfolk Southern*, if parties to a consent describe the claims that are subject to res judicata, that is sufficient to determine the parties' intent with respect to the preclusive effect of the judgment. 371 F.3d at 1289-90. Here, the Release states the claims that are subject to res judicata, and then additionally states that the only limits on the Bureau' authority going forward are those that are specifically described.

Every count of the Bureau's original complaint in this action filed in 2017 (and in the subsequent amended complaints) applies only to conduct that has occurred since January 2014, *i.e.*, after 11:59 p.m., Eastern Standard Time, on December 18, 2013. *See* Doc. 775 at 1 (defining the "Relevant Time Period," *i.e.*, the period covered by the Bureau's Second Amended Complaint, as beginning in January 2014). Thus, all of the conduct the Bureau has challenged is outside the period to which the Release applies and therefore outside the res judicata effect of the Consent Judgment.

26

The district court disagreed, however, because it found "no language in the Release supporting the ability of the Bureau to bring suit for wrongs covered by the Consent Judgment – which includes wrongs arising during the three-year term of [the Consent Judgment]." Doc. 764 at 23. In fact, of course, there is such language. As set forth above, the Release provides that the Bureau "specifically reserves and does not release any liability for conduct other than conduct related to the Mortgage Servicing Practices asserted or that might have been asserted in the complaint." Doc. 32-1 at 162. Conduct that took place in or after January 2014 had not even occurred when the D.C. complaint was filed in 2013, and thus could not have been asserted in that complaint.

According to the district court, "[t]he preclusive effect of the 2014 … Consent Judgment, as to any such wrong, does not negate the Bureau's enforcement authority, it simply limits it to the boundaries to which the Bureau itself agreed in the prior action." Doc. 764 at 23. Without any explanation, the court assumed that the Bureau had agreed to release every claim that arose during the period in which the Consent Judgment's Servicing Standards were in effect – from

27

February 2014 until February 2017. This lacks any basis in, and is completely inconsistent with, the specific language of the Release.[14]

The district court also concluded that the Release could not limit the res judicata effect of the Consent Judgment unless the Release also set forth a description of the "wrongs" that the Bureau could challenge, *i.e.*, set forth the claims that the Bureau was preserving. Doc. 764 at 23. But as explained above, this holding conflicts with this Court's conclusion in *Norfolk Southern* – a description of claims that are precluded implicitly permits all other claims. 371 F.3d at 1289. It also conflicts with the Release itself, which reserved the Bureau's authority to pursue claims that could not have been asserted in the D.C. complaint.

The district court did not completely ignore *Norfolk Southern*, but when it discussed the case, it misinterpreted it. *See* Doc. 764 at 24-25. It observed that in *Norfolk Southern*, the court was tasked with

---

[14] Because the Release waives the Bureau's authority to exercise its sovereign power – the power to enforce federal consumer financial laws – that waiver should be narrowly construed. *See Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 52 (1986).

28

determining the res judicata effect of a "prior order of dismissal based on [a] stipulated settlement." *Id.* at 25. The court then held that:

> Unlike in *Norfolk*, this Court is not tasked with interpreting the *res judicata* effect of a prior Rule 41 dismissal based on a stipulated settlement. Rather, the Court's *res judicata* ruling here is based on the preclusive impact of a prior final consent judgment, incorporating a stipulated settlement agreement….

*Id.* The district court also noted that, unlike *Norfolk Southern*, the Consent Judgment incorporated alternative dispute resolution procedures to address noncompliance with the Servicing Standards. *Id.* Thus, the court apparently believed that, unless the Release specifically excluded claims that occurred while the Servicing Standards were in effect, those claims were barred.

The district court's analysis ignores the basis of this Court's decision in *Norfolk Southern*. Again, as this Court explained, res judicata is an affirmative defense that can be waived. So, "[w]hen a defendant signs a settlement agreement stating that only some claims will be precluded in the future, it is as if the defendant is preemptively waiving any potential *res judicata* defense he would have had." 371 F.3d at 1289. The extent of the waiver is dependent upon the agreement of the parties, not on the nature of the other provisions of the

29

settlement. That is, the mere fact that the Consent Judgment incorporated the Servicing Standards does not undermine the specific provisions of the Release, which released only claims based on conduct that had occurred as of December 18, 2013.

The district court also found it significant that the parties to the Consent Judgment intended that deviations from the Servicing Standards would be actionable only if the deviations exceeded a Threshold Error Rate, and only pursuant to Consent Judgment's Enforcement Terms. Doc. 764 at 25. "Contrary to that intent, the Bureau now seeks redress for departures from the Servicing Standards occurring during the term of the Consent Judgment, without regard to the Threshold Error Rates." *Id.* at 25-26.

The district court is mistaken because in this action, the Bureau is not seeking, and indeed could not "seek[] redress for departures from the Servicing Standards." *See id.* The Consent Judgment's Servicing Standards constitute "fencing in," intended to prevent future violations. *See FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965) (an agency "is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past"). Because the Servicing

30

Standards (and the associated monitoring and testing) differed from the law's requirements, they could only be enforced under the Consent Judgment. But in the FAC, the Bureau is challenging violations of the law, not of the Servicing Standards. The only limits on the Bureau's statutory authority to pursue law violations committed by Ocwen are set forth in the Release.[15]

The court also suggests that, to the extent the FAC alleges violations of regulations that were not even in effect at the time of the D.C. complaint (*i.e.* Counts IV, VII, VIII, IX), the Bureau should have petitioned the court for a modification of the Consent Judgment to gauge compliance with those new regulations. Doc. 764 at 26 n.14. In support of such a modification, the court claims that the Bureau could have invoked the provision in the Consent Judgment that required Ocwen to comply with "applicable state and federal law." *Id.*; *see id.* at 7 n.5. What that provision actually states is that "[n]othing in this Consent Judgment shall relieve [Ocwen] of its obligation to comply with

---

[15] The district court suggests that the Bureau has conceded that the violations alleged in Counts I-IX of the FAC are "matters covered by the Servicing Standards." Doc. 764 at 26. But the court cites no authority for this "concession," which, indeed, the Bureau never made.

applicable state and federal law." Doc. 32-1 at 13. This provision does not extend the scope of the Release. Quite the contrary. The provision merely emphasizes that nothing in the Release limits the Bureau's authority to pursue Ocwen for any violations of applicable federal laws that Ocwen commits after December 18, 2013. The district court's treatment of that provision, combined with its conclusion that the Bureau could not, in a separate action, pursue any conduct that would violate the Consent Judgment, would render the Release, no matter how worded, meaningless – any law violation committed by Ocwen would violate the Consent Judgment and would thus be precluded. That result is completely at odds with the intent of the parties to the Consent Judgment and with this Court's decision in *Norfolk Southern*.[16]

---

[16] The district court also discussed *Lawlor v. National Screen Service Corp.*, 349 U.S. 322 (1955). Doc. 764 at 24. In *Lawlor*, the Supreme Court held that an earlier settlement did not bar a subsequent lawsuit. In distinguishing the case, the district court focused on the fact that in the first lawsuit, the *Lawlor* plaintiffs did not press their demand for injunctive relief whereas here, the Consent Judgment incorporates forward-looking provisions. However, the basis of the Supreme Court's decision in *Lawlor* was that an earlier settlement "cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case." 349 U.S. at 328. That is particularly true here, where the Consent Judgment includes a Release that states exactly that.

## II.   THE DISTRICT COURT INCORRECTLY APPLIED TRADITIONAL PRINCIPLES OF RES JUDICATA

As explained, traditional principles of res judicata do not apply when assessing the res judicata effect of the Consent Judgment. *Norfolk Southern* dictates the appropriate analysis, and applying that analysis, the FAC is not barred by the Consent Judgment. Accordingly, this Court need not consider the district court's application of traditional principles of res judicata. However, if this Court chooses to do so, it should conclude that the district court applied those principles erroneously.

This Court has explained traditional res judicata principles:

a claim will be barred by prior litigation if all four of the following elements are present: (1) there is a final judgment on the merits; (2) the decision was rendered by a court of competent jurisdiction; (3) the parties, or those in privity with them, are identical in both suits; and (4) the same cause of action is involved in both cases.

*Ragsdale v. Rubbermaid, Inc.*, 193 F.3d 1235, 1238 (11th Cir. 1999).

The Bureau does not dispute the district court's conclusion that the first

33

three elements were met here. But the district court erred in its

analysis of the fourth element.[17]

> As this Court has explained:
>
> The determination of whether a litigant has asserted the same cause of action in two proceedings depends upon whether the primary right and duty are the same in both cases. Res judicata acts as a bar not only to the precise legal theory presented in the previous litigation, but to all legal theories and claims arising out of the same operative nucleus of fact. A court, therefore, must examine the factual issues that must be resolved in the second suit and compare them with the issues explored in the first case.

*Pleming v. Universal-Rundle Corp.*, 142 F.3d 1354, 1356-57 (11th Cir.

1998) (citations and quotation marks omitted); *see also Maldonado v.*

*United States Att'y Gen.*, 664 F.3d 1369, 1376 (11th Cir. 2011). When

the district court assessed whether the same cause of action was

involved in this case as was involved in the 2013 case, it considered the

counts in the FAC in two groups. The first group involved violations

---

[17] The district court incorrectly claimed that "the Bureau recognizes that Ocwen has shown 'facial overlap' between the text of the Bureau's current claims and the Servicing Standards imposed under the [2014] Consent Judgment." *See* Doc. 764 at 17. In fact, the Bureau merely noted that "*Ocwen argues* there is facial overlap between the text of the Claims and the Servicing Standards." Doc. 740 at 6 (emphasis added). Nowhere did the Bureau accept or adopt Ocwen's position.

based on flaws in Ocwen's System of Record (*i.e.*, the data it maintained with respect to the loans it serviced). Doc. 764 at 17-19. The second group involved violations that the district court concluded were, or could have been, addressed by the metrics. *Id.* at 19-21. (The metrics were set forth in Exhibit D to the Consent Judgment (Doc. 32-1 at 122-158) and were used by the monitor to assess whether Ocwen was complying with the Servicing Standards. Doc. 764 at 20.)

With respect to counts based on flaws in Ocwen's System of Record, as the Bureau explained in the FAC, Ocwen maintained data regarding the loans it serviced in a record-maintenance system known as REALServicing. Doc. 481 at ¶ 31. The FAC alleged that, since 2014, Ocwen loaded inaccurate information into REALServicing. *Id.* at ¶ 34. And in some instances, even when Ocwen loaded accurate information into REALServicing, flaws within that system caused it to generate inaccurate information about borrowers' loans, which Ocwen used when servicing mortgages. *Id.* at ¶ 34. Four counts of the FAC alleged violations based on Ocwen's use of inaccurate data from REALServicing (Counts I, II, V, VI). Although the district court concluded that these violations derived from the same nucleus of operative facts that

35

underpin the D.C. complaint, the court never mentioned any allegation from the D.C. complaint that alleged a similar violation. Instead, the court reached its conclusion based on one provision in the Servicing Standards that required Ocwen to have its underlying records "periodically independently reviewed for accuracy and completeness by an independent reviewer," Doc. 32-1 at 74, and on the fact that, on several occasions, the monitor had received reports of those reviews. Doc. 764 at 18. Thus, the court concluded:

> the Bureau's current allegations regarding SOR [System of Record] deficiencies plainly derive from the same nucleus of operative fact underpinning the [D.C. complaint], and it is apparent that SOR accuracy issues were specifically addressed in the … Servicing Standards and were part of the servicing activity routinely reviewed by the … Monitor. Given this overlap, the Bureau's newly asserted statutory violations based on alleged SOR defects do not establish a "new wrong," and are barred by traditional *res judicata* applications.

*Id.*

But it is not plain from the court's analysis that the four counts in the FAC that are based on Ocwen's inaccurate records derive from the same nucleus of operative facts underpinning the D.C. complaint. Indeed, the court never even considered the facts that underpin the D.C. complaint. Instead, it merely looked at the fencing-in relief to

which Ocwen agreed in December 2013. The fencing-in relief goes above and beyond the claims alleged in the D.C. complaint; that is the purpose of fencing-in relief. *FTC v. Colgate-Palmolive*, 380 U.S. at 395. Thus, by simply considering the relief to which the parties agreed, the court failed to assess the factual issues that would have been relevant if the D.C. complaint had been litigated.

The D.C. complaint focused on the filing of false documents, robo-signing, misrepresentations regarding loss mitigation programs, and deceptive practices with respect to loans that had been transferred to Ocwen. The FAC, on the other hand, focused on Ocwen's use of inaccurate information in its day-to-day operations, and how, as a result of using that information, Ocwen made misrepresentations regarding loan terms, borrowers' payments, payoff amounts, escrow analysis and payments, and insurance coverage. To establish the allegations in Counts I, II, V, and VI of the FAC, the Bureau would have to establish that since January 2014, Ocwen relied on inaccurate information to service loans, Doc. 481 at ¶¶ 207, 240, and that Ocwen communicated this inaccurate information to borrowers, *id.* at ¶¶ 216, 249. This is quite different from what the Bureau would have had to establish if the

D.C. complaint been litigated. Thus, the district court erred because it focused on the fencing-in relief related to Ocwen's system of records, not on the counts alleged in the D.C. complaint.

The district court also rejected the Bureau's argument that the metrics were insufficient to assess Ocwen's compliance with TILA, FDCPA, and RESPA. (The FAC alleged violations of all those statutes, *see* Doc. 481 at ¶¶ 232-277; the D.C. complaint did not.) However, according to the district court, the mere fact that the Servicing Standards and the monitor's application of the metrics would have been insufficient to identify such violations "does not defeat an overlap of claims or causes of action." Doc. 764 at 20. Instead:

> [h]aving agreed to test compliance with the Servicing Standards under Metrics agreed upon under the Consent Judgment, the Bureau cannot now claim that testing Ocwen's compliance with those standards under any other set of metrics somehow implicates the existence of a new wrong not covered by the [Consent Judgment].

*Id.* at 21. According to the district court, if the Bureau had been concerned that the metrics were not sufficient to assess whether Ocwen was violating laws other than the CFPA, it should have petitioned the D.C. district court to resolve the problem. *Id.* Again, this analysis is off the mark.

As this Court explained in *Pleming v. Universal-Rundle*, *supra*, to determine whether claims regarding violations of TILA, FDCPA, and RESPA were barred by the Consent Judgment, the court should have considered "the issues explored in the first case." 142 F.3d at 1357. Of course, no issues were explored in response to the D.C. complaint. But the district court should, at least, have considered the factual issues that *would have been* addressed had the 2013 case been litigated, not the fencing-in relief to which Ocwen agreed as part of the settlement. Had it done so, it would have realized, for example, that Ocwen's failure to conduct timely escrow analyses, to provide escrow statements, or to make insurance payments are relevant to the FAC, *see* Doc. 481 at ¶¶ 254-260, but are not relevant under the D.C. complaint. Moreover, in this part of its decision, the court extended the res judicata effect of the Consent Agreement not only to what the monitor actually oversaw, but also to what he would have overseen had the Bureau sought modifications to the Servicing Standards and the metrics. *See* Doc. 764 at 21. This approach has no limit and goes far beyond traditional principles of res judicata.

The flaw in the district court's analysis is particularly apparent with respect to Counts IV and VIII-IX. Count IV alleges that Ocwen violated a provision of TILA's implementing Regulation Z (12 C.F.R. § 1026.41(d)) that did not take effect until January 2014 – after the D.C. complaint and proposed Consent Judgment had been filed. This provision requires a servicer of home mortgages, such as Ocwen, to provide borrowers with a monthly statement that includes certain information regarding mortgage payments, including the total of payments received during that year, and the amounts allocated to principal and to interest. Count IV of the complaint alleges that Ocwen failed to provide that notice.[18] Doc. 481 at ¶¶ 228-231.

Counts VIII-IX allege violations of provisions of RESPA and its implementing Regulation X that also did not take effect until January 2014, and that required Ocwen to provide certain protections to borrowers who had filed applications for loss mitigation or who were facing foreclosure. *Id.* at ¶¶ 254-277. Again, there is no way that

_____

[18] Although the Consent Judgment did require Ocwen to provide certain disclosures to borrowers, those disclosures were much less detailed than those required by the 2014 amendments to Regulation Z. *Compare* 12 C.F.R. § 1026.41(d) *with* Doc. 32-1 at 72-73.

compliance with regulations that had not yet taken effect at the time of the conduct at issue in the D.C. case would have been addressed had the D.C. complaint been litigated. But the district court ignored this problem when it held, without developed analysis, that "the Court is not persuaded that the overlapping consumer protections relayed under these regulations support a showing of a 'new wrong.'" Doc. 764 at 22. The court gave no explanation as to why these new regulatory requirements, requirements not addressed in the D.C. complaint or in the Servicing Standards, are nonetheless barred by res judicata.[19]

The court's analysis of the res judicata effect of the Consent Judgment using traditional principles shows why that method of analysis is inappropriate. In December 2013, the Bureau simultaneously filed both the D.C. complaint and the proposed Consent Judgment. Because the Bureau filed the D.C. complaint as part of a settlement, it included only the essential factual allegations. Lacking

---

[19] For example, Count VII of the FAC alleges that Ocwen failed to conduct annual escrow analyses for borrowers, as required by RESPA's implementing Regulation X. Doc. 481 at ¶¶ 258-59. There is nothing in the Consent Judgment addressing Ocwen's performance timely escrow analyses.

detail in the D.C. complaint, and in the absence of any actual litigation in that case, the district court instead based its res judicata analysis on the fencing-in relief that was part of the settlement rather than on the actual facts underpinning the D.C. complaint. Even if it had been appropriate for the district court to apply a traditional res judicata analysis to the Consent Judgment, there is no support for the way in which it conducted that analysis.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Stephen Van Meter
  *Acting General Counsel*
Steven Y. Bressler
  *Assistant General Counsel*

s/*Lawrence DeMille-Wagman*
Lawrence DeMille-Wagman
  *Senior Litigation Counsel*
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
(202) 435-7957
lawrence.demille-wagman@cfpb.gov

## Certificate of Compliance

This brief complies with the length limits permitted by Fed. R. App. P. 32(a)(7)(B). The brief is 8635 words, excluding the portions exempted by 11th Circuit Rule 32-4. The brief's typeface and type style comply with Fed. R. App. P. 32(a)(5) and (6).

June 1, 2021                       /s/ *Lawrence DeMille-Wagman*

                                   Lawrence DeMille-Wagman
                                   *Senior Litigation Counsel*
                                   Consumer Financial Protection Bureau
                                   1700 G Street NW
                                   Washington, DC 20552
                                   (202) 435-7957
                                   lawrence.demille-wagman@cfpb.gov

**Certificate of Service**

I hereby certify that on June 1, 2021, I caused the foregoing to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and they will be served by the appellate CM/ECF system.

June 1, 2021                    /s/ *Lawrence DeMille-Wagman*
                                Lawrence DeMille-Wagman